Our final argued case of the day is 22-1840, Magnacross LLC v. Oki Data Americas, Incorporated. Mr. Bennett. Good morning, Your Honors. May it please the Court. There are two issues, distinct issues, that are before the Court today. And the first one is whether the District Court correctly held that the Claim 1 of the 304 patent was patent ineligible under both steps of the 101 analysis. And the second issue is that was there a contract, a settlement agreement, between the parties that would basically negate all the other issues in the case and that the Court should enforce the settlement agreement. And the District Court found that there was no contract, and therefore there was no breach of the contract on summary judgment and dismissed the counterclaim of Magnacross. On Section 101, with respect to the abstract idea, the District Court held an abstract idea that was far broader than even the defendant proposed. The defendant proposed language that came out of the claim regarding dividing a channel into subchannels and then putting data from data sensors into the subchannels. The District Court said that the claim was directed to processing and transmitting data. Now, that is far broader, and that doesn't give you any idea of what the claim is about. It doesn't explain to you what the problem is that was addressed by the invention. So in this case, it's laid out not only in the claim language but in the specification that the problem is that when you have wireless transmission and you have data from data sensors with substantially different data rate requirements, that you can have very inefficient use of the channels. So you can have either channels that are too small or you can have channels that are too large, and therefore you're just wasting your space when you're doing these channels. So what the inventors came up with was that, okay, if you have a situation where you have wireless transmission and you have data from sensors that have substantially different data rate requirements, that the way that you can solve this problem is by first dividing the data channel asymmetrically into subchannels and then assigning the data from the data sensors that have substantially different data rates to those subchannels in accordance with the data rate requirements. I agree with you that what the claims are directed to is more narrow than what the district court found or held. So let's say that I think or that I agree with your characterization you just gave, which I think is that it's more directed to having differently sized subchannels for differently sized loads from the data sensors. Why isn't that itself an abstract idea? I think that's one of the critical questions here. And let me just give you an analogy. When I drive to work, if I take a road here in town called Canal, two lanes go into the city in the morning. Whereas going home, there's two lanes instead of having... So there's three lanes, two lanes go in, going home, two lanes go out. They switch it out according to the amount of traffic coming in and coming out of the city. Why isn't the idea of having differently sized subchannels or paths for differently sized loads, something that in itself is abstract? And on the other hand, it's a technological solution to a technological problem. But that's the issue, right? Right. And it's how far do you go down in trying to describe the invention when you determine what that abstract idea is? Do you look at it from what the problem is? Do you look at it from what the inventor sets out as a solution? So in the specification, it lays out 12 different U.S. and foreign patents that was trying to address the problems that were at issue here. They would separate out some signals. They would do different tweaks to what the invention, what was occurring in wireless transmission. But in all those cases, they used the same size channel. So in this situation, I think if you come down to the level of, well, what was the solution that they gave, which in this situation is, well, let's now asymmetrically divide these channels and then take the data from those data sensors with substantially different data rates and put it into those channels in accordance with those things. I think that is far too much detail to get into when you're describing what the abstract idea is because the issue is you have substantially different data rates. What the claims are directed to as opposed to what the abstract idea is for your benefit. Yeah, sorry. So with your example with respect to the cars, when you're dealing with substantially different data rates, it could be an order of magnitude higher. So you could have one channel that handles all of it if you had a large enough channel, or you may need 10 channels to handle it. So in the patent, it talks about the situation where you have 16 channels. And so you divide whatever you have in terms of data coming from sensors into those 16 channels. But if you have one channel, one sensor that's maybe 10 or 100 times more data than the other channel, it really doesn't match well to how you divide those sensors or those data. I'm going to be telling you right now, I don't think you're really answering my question in a way that I'd like to hear. So the Supreme Court has told us that we can look at analogies and see whether something, sometimes looking at analogies to determine whether something is abstract or not can be helpful. So there's this basic idea out there that when you have too much volume, even like in my water glass, could I fit this whole pitcher in the water glass? I have different sized glasses for different amounts of liquid. So why isn't the idea that, hey, uh-oh, I've got too much data and I can't fit it all in one path. How about if I just make the paths of different size for different amounts of data? Why isn't that just an idea that's abstract? I would say that this court, at least in the data engines case, has said that it's not merely enough to trace an invention to a real-world analogy. I think you can probably trace almost every invention to a real-world analogy. You have a drug that cures cancer and you can say, well, drugs have cured illness before. This is just another drug that cures an illness. It's really directed to an abstract idea. So the fact that you can do an analogy I don't think necessarily makes it an abstract idea. I think you need to look at what the problem is that's trying to be solved and then from what that problem is being solved, then try and determine whether an analogy would fit or does it not fit to what's actually the inventive issue here. And the inventive issue relates to the problem of I have multiple sensors that have substantially different data rate requirements. How can I make the transmission of that data more efficient? Saying that, well, you can put things in different vessels. Then you're starting to get into, well, how did they come up with the idea of solving this problem? So I think that when you get down to an analogy where you're just talking about different vessels, I don't think you're considering what the problem was that was being faced by the inventors here and that others were looking at this same problem and came up with different solutions. Would you agree that the problem that the engineers here were facing in data transmission where you had these different data sensors spitting out different amounts of data is very akin to the problem an urban planner would face when they're dealing with rush hour traffic coming into the city and leaving the city in the evenings and then an urban planner deciding to make the middle lanes designed for coming into the city during morning rush hour and then making those same middle lanes for exiting the city during afternoon rush hour. Isn't that ultimately the nature of the problem facing both the urban planner and the inventors here in this data transmission situation essentially the same problem? I think it's a different problem because in this situation you're sending information from two sensors to the same location. When you're dealing with an urban planner you're trying to figure out these people getting out of the city at the same time these people are getting into the city. So you're not dealing with the same problem of how do I get two things from the same location to the same location at the other side. So I think that urban planner thing is a slightly different analogy because you're crossing things and same thing with your honors view of traffic coming in and out of the city is that you're not dealing with the situation of I have two things sending information. It's the same solution in the sense that you're assigning the middle lanes to whichever source of flow moves those middle lanes the most whether it's inbound traffic or outbound traffic. But in that situation you're either dealing with flow in both directions where the flow coming out into the city or whichever let's say. Just think of it as two flows instead of diametrically opposite directions. We're just talking about two flows of traffic and now we're trying to figure out how best to allocate all the available lanes of the road to the different flows of traffic. And then in the morning rush hour you want to give as many lanes as possible to the inbound traffic as opposed to the outbound traffic. And that in essence sounds very much like what the solution here is which is we're trying to figure out where's the greatest source of data flow and we want to assign them a larger sub-channel, a larger transmission pathway compared to other data sensors that are not outputting much data. Respectfully, I don't think that's correct because I think the analogy would have to be what you're looking at is you're having everybody in the suburbs coming into the city and you have a one channel that everything has to go through. Which suburbs do you allocate the most lanes to and which ones do you allocate the fewest lanes to? But I don't think that's what's happening here is you're not having a single highway coming into a data processor which is what the claim is. You have sensors sending data to a data processor. You have a channel that then has to be subdivided based on the data being sent into that channel. It was already known how to divide a channel into sub-channels, right? Yes, John. I guess why wouldn't it have been obvious to do what these inventors did under Section 103? I'm just curious. In the end, if the solution, if we want to call it a solution, it does strike me as something rather simple, rather straightforward. I guess in one sense we could call it technical but in another sense we could say it maybe doesn't require an engineer with 20 years of experience to say instead of dividing it by half, why not divide it in an unequal way? So that we can create sub-channels that are sized in accordance with the needs of different data sensors. Well, I would say that if you want to do an obvious analysis as opposed to an abstract idea analysis, at least the patent says there were at least a dozen other patents that they pointed to that did not solve it. So if you're looking for potentially a long-felt need that was not being solved, this was one of those situations. You had 12 patents trying different ways to solve the same problem. It didn't work. So at least even on the face of the patent, you have an issue with respect to obviousness that I think is lacking in that there are definitely fact issues that would need to be decided before you could say, well, it sounds obvious. Maybe it sounds obvious looking back, but at the time, since 1998, maybe it wasn't obvious. Do you want to do your rebuttal? I do want to make one point. I do want to address the other issue of contracts just briefly because we think that there was a contract between the parties. I think the issues that the district court said are, first, there has to be evidence that there was a later attempt for a written agreement means that there wasn't evidence of contract. I think the Texas law is consistent that just because you ask for a written agreement and you try and get it doesn't mean that you didn't have an original contract. And then on the second issue is that all these additional terms that are needed, a license, covenant not to sue, release, is there going to be extensions? When you have a patent that is expired and you dismiss the case with prejudice, you don't need a license, you don't need a covenant not to sue, you don't need a release, you don't need any extensions. So all these other terms that Her Honor said were required in the contract in order for it to be a contract were essential terms were not actually essential. So I'll reserve the remainder of my time for the committee. Thank you. Mr. Labovold. May it please the court. I'd like to address a couple of points that were addressed with counsel first. First is the analogy of Canal Road or any other similar situation we have in the area. It's exactly the same thing. We're talking about maximizing the conduit you have for the flow. And in that case, we know that in the morning there's a greater flow coming into the city than there is going out. And so we divide the lanes and allocate them in such a way that they are using the most bandwidth in that circumstance. What confuses me about this case is maybe what you just described is an argument for 103 but not 101. In other words, why is it that the fact that the nature of this invention might lend itself to a real-world analogy like traffic flow management necessarily mean that what we're dealing with here is an abstract idea? This is not a situation where we're dealing with the convergence of 101 and 103, respectfully. Because when we step back... I guess what I'm wondering is, is there a rule of law that we have that if you can analogize a claimed invention to something in the real world, then that necessarily is an immediate conclusion about that abstract idea. Absolutely not.  Another analogy, for example, would have been is that this is doing it in a wireless way. Before that, if you had sensors, the sensors aren't changed. Within the system, none of the equipment is changed. The only thing that they're going to do is this dividing and allocating. So with that as the premise, if we look at it the wired sense, in that sense, we know that some wires can handle more capacity than others. In your house, you have higher gauge wires for carrying certain amounts of electricity. You have lower gauge for the standard wiring. Before it was done wirelessly, it was done with cabling. And if you had higher data requirements, maybe you had to use a Cat5 or a Cat6. For me, this even sounds more like a prior analysis. But it's not, because what we have here in bringing us purely into the 101 sense is akin to what we've seen in many cases, but in particular the Affinity case. We talk about in the claim, it says dividing and allocating. So we have these concepts, and how are they done? That's the question. Getting back to your electrical wire example, if we had a system, a wiring system for providing electricity to a house, and wherein we use the higher gauge wires for hookups to all the electrical equipment in the kitchen, and then use lower gauge wires for all the electrical needs of individual bedrooms, would that be an abstract idea? The idea of just dividing and allocating is the abstract idea. And in that particular analogy, we're looking at an application of the abstract idea. What I just described is an abstract idea? The idea of dividing and allocating? Yes. The way you've described it is the application of the abstract idea. I don't know why you're saying dividing and allocating. What I'm saying is you've got an electrical system for a house where for the electrical equipment for the kitchen, you use the higher gauge wire, and then for individual bedrooms that just have needs like for lamps and electric blocks, you use a lower gauge wire. And that's the claim. Okay. That's an abstract idea? I think it is. And I think the way you've done it, actually, is actually you may have gone beyond the abstract idea because you actually said how you would do it, and that you would have specific wiring based on those specific wiring requirements, and you would have had the certain thing, and you would have actually done something. Yours has a little bit more of the how, but I still, on second, I think you are still in the abstract idea. I'm sorry for interrupting you, but what if this claim said that the how was by having time or frequency multiplexing? Well, there is time or frequency multiplexing, but it still doesn't say how. Let me explain what I mean by that. We know we have these sensors. How do we know what those sensors' data requirement is, and how does the multiplexer know that? We know nothing about that. How does the multiplexer then use that data in a way to perform this allocation of the channel before it does the multiplexing either on time-based or frequency-based or packet switching, the three known types of multiplexing? What about the fact that the patent talks about how it gives examples of different sensors that carry more data than other sensors? But again, how does the multiplexer know that? It doesn't say how the assessment is done of what the sensor's data output or bandwidth requirements are. How that then goes into play with how the multiplexer... which data sensors are outputting the heavy amounts of data compared to other data sensors? I think we would have a very different argument because we would have a situation where there was actual structure, actual requirements, actual rules, as we've seen in some of the case, to be followed. I guess that's the question that I keep coming back to. Why isn't there a quote-unquote rule in this claim when the claim calls for creating subchannels that are sized in accordance with the needs of the different data sensors, outputting relative different amounts of data? Because that's a functional result-based answer without telling you how you actually do that. It is doing it in some way, magically, that you've assessed what the data requirements are, you've assessed what the channels are, and then you've allocated based on some criteria that we don't know. Because we don't know how any of that actually happens other than what would have been described as the city planner or might have been described as the electrician who are using now a computer to do what has been done before manually through someone else's human expertise. Because it doesn't say in this system how this standard multiplexer, taking data from these standard sensors without changing any data... But what the claim is doing is it's taking this fixed resource called the data channel and it's chopping up that fixed resource in a way that's different than the prior arc. At least that's what's been alleged. The acclaimed advance is we're going to parse out this fixed resource in a different way than we've done before, in a way that better right-sizes each of the resulting subchannels for the different data sensors. I guess I keep coming back to the question of why isn't that enough to say, yes, that is a non-abstract technique that improves the data transmission process. Because after all, we now have smaller data channels for the smaller data sensors so that we're not dealing with underutilized subchannels. And then we're also better fitting the large data coming off other data sensors that are now getting better accommodated with a relatively larger subchannel. So overall, we've got a more efficient data transmission system. Well, respectfully, if it was that simple, then the examples of the prior arc would demonstrate that it has to be more than that. Specifically, if we look at EP patent 048354982, and this is the one that cited column 2 from lines 14 to 26. In that example, what happened was the applicant or patentee, whatever the situation is, had a situation where they had a data requirement and they had a control channel. And they described how they divided out the control channel because that was much smaller, put the control separately through that control channel, and left all the remaining bandwidth for the primary data, which is what they needed. That is doing exactly the abstract concept of dividing and allocating. It sounds like you've got a 102 argument. Well, here is more on the step 2 side to look and see if there's anything inventive about specifically the abstract idea and the context in which the patents described. We would submit that this is evidence to show that this is unobvious, not unobvious, known, conventional. What if I were to tell you that I'm right on the line in this case? I don't like the characterization of the abstract idea by the district court. I think the court below looked at this claim at way too high of a generality and didn't appreciate what was the purported advance here, which was the manner in dividing up the channel. But at the same time, this is a very relatively simple invention, and so maybe it is just an abstract idea. I guess what I'm wondering is, are the parties still talking about settlement? They have not at this point. There have been discussions that have gone back and forth. But in response to the question, underneath the final question, I was more focused on the primary question, but okay, I can talk about it. Can I ask you about the claim? Do you think this claim is written in a Jepson format? I mean, it doesn't say set improvement comprising, but it says characterized by, and that might be a better question for your adversary, but I was wondering what your view was. We haven't looked in that respect, and I don't think it necessarily is going to change the analysis, because, again, we view it to be that there's the abstract concept and without saying how to do it. And they're really more aspirational. They're these goals of what they want to do in the same way as creating a claim for winning the lottery comprising picking the correct numbers. They say that they have specificity. The dividing and the allocating are very specific, but they don't tell you how it's accomplished in a practical sense with the equipment that's talked about. There's no conventional equipment. What if, let's just assume hypothetically, I understand what your arguments are, but what if a POSA would understand how these steps would operate? Does that impact how we do our one-on-one analysis here? When you say they don't say how it's done, what if a POSA would look at it and say, well, of course, I know how it's done. I mean, dividing up communication channels has been well-known for a long time, maybe not asymmetrically, but, of course, we know how to create subchannels, and, of course, we know how to allocate data to different subchannels. So let's just assume for a minute that a POSA would understand that. Ben, what is your one-on-one argument for why it's not specific enough? Well, we have two things there because now we're pushing the claim closer, pushing the argument, if we will, more onto the 103 side because it's describing what is specifically said is the prior art, simply dividing down the control channel into a smaller channel and the other. So it has to be in the how. That's in the same way that there was the, you know, custom media is another great case in this regard. There's no explanation of how you're going to transform this abstract idea into a patent-eligible subject matter because it seems to me that we're close to just looking at the technological environment as the only distinction here. And simply by putting that abstract idea into a particular technological environment, as this course has said, it doesn't get us over the hump of it still being an abstract idea. If we look at it as an abstract idea and we go to step two. Do you maintain that? I mean, the way it's presented by your adversary is that there's a technical problem here and that technical problem is solved by a relatively simple solution. Let's say we take their view that it is a technical problem with a relatively simple solution. Why isn't one-on-one satisfied there? Well, because when you get to the answer, in theory, if everything that was put out there is the beauty of this, well, we have a sensor, multiple sensors. One of them has a really big data requirement. The other two in this three example I'll give you, those have small... And they only have to have two. I know. Let's make it a little more challenging. So we've got this big one. Oh, we have two sensors. We divide it up into three. It can go a lot of different ways. We'll leave the numbers to be. But the idea is that we don't want to have a situation where you've got a huge data that's not fitting into, and most efficiently, into its channel. It can't go into that little channel because if it goes into that little channel, it's going to have to be divided up into other channels. Or if you have a smaller one, that's going to have to go into a smaller channel. If not, it has unused space that could have been used by the big users. But if you look at column six, column six at line 51 through 58, 57, secondly, it is to be understood that while the invention has been discussed and defined by reference to specific subchannels and the allocation of data from sensors to respective ones of these, it is understood that a sensor producing a high data rate for that purpose have allocated to it a number of subchannels, or thus a group. So what they're telling you is even after you've done this division and allocation that was supposed to be to optimize, if you still haven't done it right, you're still in the situation where it doesn't work efficiently, and therefore you just do what's always been done, divide it up amongst a couple of others. That's what you do, and you send it down two channels divided. That takes away the entire emphasis of why this is important when it says you can just do what you did the old way. I see my time is up, so unless there's any other questions? Do you want to say something about the contract case? With regard to the contract, we believe the evidence is very clear that there was no contract. The idea that we've said that they forfeited the expired patent, they've now come forward and said that it was known that there was only one patent, there was nothing else. But when you look at the amendments to the license agreement that they sent, and we had amended it so that it covered other patents owned, controlled, and then they made amendments there. Are you talking about the settlement of this case right now? Yes, I am. Okay, I'm sorry. Keep going. There was not a settlement reached. There were settlement discussions. There were never agreements were reached on the particular terms. Their discussion was back and forth on affiliates, what the scope of the release is. There were discussions back and forth on which patents would be included, and no agreement was ultimately reached. I'm just curious. Why did it look like you were on the cusp of an agreement? Why was it that you ultimately decided to break it off, break off the negotiations and then file the matter in motion? Simply put, the nature of the discussions and what was happening with the attorney involved was such that there became a lot more issues than were capable of being resolved in a sense that had been proposed previously, if I can put it delicately. Thank you. Is there any other questions? No, thanks. Okay, thank you very much. Your Honors, I think from the perspective of the 101 analysis, I think it's important to realize that this patent dates back to 1998. Sometimes we have different views of what may be reasonable now versus what would have been reasonable in 1998 before iPhones and all those things. When you're looking at a real-world analogy, I think here a real-world analogy really isn't helpful because what the patent explicitly is talking about is it recognized a problem that was not resolved in the prior art, and what it was looking to do was then saying, Well, what have others done? How can I do this differently? Now, it did come up with a solution that Your Honors have tried to come up with, analogies we disagree with, but they are analogies. But when you're looking at whether analogy would be applicable in this case, I don't think you can look at it from the perspective of is this a good analogy. I think you have to look at it from the perspective of the whole patent prosecution history and the claim language where they look for a particular problem in computers. They see that it's not being solved. They find out one way of solving it, which is asymmetrically dividing it and then assigning the channels, assigning the data from the substantially different data rate requirement sensors to those channels. It's according to its needs. Yes, Your Honor. And Karl Marx said that. Excuse me? Nothing. Keep going. And so if you look at the record as a whole, which is not just the claims but what they were trying to solve and the prosecution history, I think the analogy really isn't a good way to go in this case, and an analogy shouldn't really be binding as if I can come up with an analogy because that would be like saying an inventor says, well, I was inspired by the way a butterfly's wings moved. And then you could say, well, now you're abstract idea because you just did the same thing the butterfly's wings did. Well, no, it may be a good analogy for how we came up with the invention, but that doesn't mean that's what the invention is directed to. And also the specification provides details, a lot of details. It provides schematics of how the circuits should be set up and describes how data can be allocated using the multipliers. The other side was saying, well, you just haven't really described enough in the claim how all of this is going to be accomplished. We don't know how the system is going to understand which data sensors are helping relatively high versus low data and then how we're going to hook up the various subchannels to the various data sensors, etc. And so that is a big piece of our case law, which is to ask ourselves to what extent is there enough implementation detail in the claim to satisfy ourselves that there is in fact the true application of an abstract idea that we have a real invention on our hands versus something that's merely functional and abstract. So can you speak to that in a few seconds? Yes, in the claim language we think there is sufficient detail for a person of ordinary skill in the art to know how to do this after reading the specification. There is sufficient detail. What about a Jepson claim before you're done too? Is it a Jepson claim? Is the claim itself in that preamble present what's in the prior art? Respectfully, Your Honor, I haven't analyzed it from a Jepson perspective. I think what the claim in the preamble is trying to set up is where this method is being used, what the situation is. So you have data sensors, you have a processor. It has to be wireless because there's different issues with wireless transmission because you're using a fixed channel versus, for example, wired. You can just pull out another cable. So that's why there's an advantage to doing wireless. And you're also sending it to the same processor. So that's the setup for where the invention is in addition to the language in the claim that talks about the data sensors have to have substantially different data rate requirements. Does anything in that preamble help answer the how-to question? How to? Well, the question was I understood the question that you were answering just now was whether the claim gives enough specificity to tell you how it works so that we know that it's more than just the abstract idea. And then I asked you if this was a Jepson claim because I was wondering if that related at all to you said it gives the environment, but does that help with your, oh, it does give more detail, so it's not just an abstract idea. It's got more details to it. Well, yes, I do in that respect because it has to be a wireless communications, and you have to have two data sensors, and you're sending the data to a data processor. So this would be like the situation where you're setting up what the method is by explaining you're dealing with a car, and you're looking at the catalytic converter, and then you're making changes to the catalytic converter, and then the steps after that without having the context of where this invention is being applied don't really make sense. So I think from the perspective of is the preamble necessary for the context and help understand what the invention is, yes, I do believe it is necessary, but there's other aspects of the limitations that give more detail such as the data sensors having substantially different data rate requirements that provides even more detail to explain to the person of ordinary skill in the art the context of the invention and how to apply it. Okay. Thank you very much, Mr. Bennett. The case is submitted, and that concludes today's arguments. Thank you.